THOMAS, Justice.
This case was considered by the court on another occasion and the judgment of the trial court was reversed. Meade v. State, Fla., 85 So.2d 613. We did not at that time, however, pass upon the merits but only upon the procedure followed in trying the appellant at once upon two indictments. In each of them he was charged with murder in the first degree, in one with having killed one Domonick Albonizio, in the other with having killed his wife, Evelyn Meade.
In the second trial, which we now review, appellant was convicted of the murder, in the first degree, of Evelyn Meade and the jury did not recommend mercy, consequently the court, upon adjudging the appellant guilty of the offense, sentenced him to death by electrocution.
The appellant has presented six points for our consideration and determination. We will resolve first his last point because it constitutes a challenge to the sufficiency of the evidence to support a judgment of guilty of murder in the first degree and a sentence of death. By reading at the outset the evidence, a duty imposed on us under Sec. 924.32, infra, even when the sufficiency of evidence is not expressly questioned, we can better understand the other questions presented in the brief.
From the record it appears that a certain house in Hollywood was occupied by Evelyn Meade, Domonick Albonizio and the 16 year old son of the woman by a former marriage. On the night of the homicide, Albonizio and the woman had retired to their bedroom and the son had gone to sleep on a couch in the living room. The boy was awakened by appellant who had a gun and a flashlight and who proceeded *778 in a subdued voice to call Albonizio “dirty names”. The appellant quietly assured the boy he would not harm him or his mother, although she had done a “terrible thing” by “calling the police on him,” a reference on which we will presently enlarge, but he stated that he intended “to get” Tiny, a nickname for Albonizio, and had travelled 1700 miles for the purpose. The appellant went to the porch, then returned as Albon-izio came out of the bedroom and entered the bathroom. When Albonizio reentered the bedroom, the appellant followed and the boy heard two shots. The appellant immediately brought the woman into the living room and seated her on the couch. There followed a colloquy which would add little to the story of the tragedy except that the appellant asked her for money and entreated her to go away with him. During the conversation the woman slipped to the floor and as she sat there the appellant suddenly fired two bullets into her head killing her instantly. The boy then shoved appellant, and fled.
We should say here that this narrative, which we have considerably condensed, was given by the only survivor, except appellant, of the four persons who were present when the shooting occurred and that it was not interrupted by any objections by the appellant’s attprneys. The significance of the absence of any interruption will appear when we presently discuss two of the other questions posed by the appellant.
We will elaborate on these facts when we reach the statement of the appellant, made to the officers soon after his arrest, subsequently reduced to writing by the stenographer who recorded it in shorthand, and introduced in evidence also without any objection on behalf of the appellant.
 In presenting his argument of the sixth, and last, point the appellant insists that he should be granted a new trial or that this court should reduce the judgment to one of manslaughter, as we can do under Sec. 924.34, Florida Statutes 19S3, and F.S. A. He prefaces his contention with the claim that he acted in the heat of passion and that the state failed to prove beyond a reasonable doubt that he formed a premeditated design to kill his wife. He cited the decision in Febre v. State, 158 Fla. 853, 30 So.2d 367, to support his position. Of course, in that case we were dealing with the conviction of a defendant who saw his wife and a nude man emerge from the bedroom the husband had formerly occupied and killed his wife’s paramour. Here we have the case where the wife was killed under like circumstances. But the facts are not so similar that the relief granted the appellant in the cited case should be given this appellant.
Here the appellant tracked down his quarries and, we think, deliberately murdered them at the end of the trail. We have already learned from the record that he told the boy he had travelled 1700 miles' to “get” Albonizio. But, in the light of other facts appearing in the statement, to which we have already alluded, and the occurrences on the fateful night, it would not be logical to conclude that he has formed a premeditated design to kill the man, but killed the woman only through passion engendered suddenly after he got into the house that the two victims occupied.
It is probably true that he entertained affection for the woman and hatred for the man, but he also had a grudge against the wife evidently because she reported him to parole authorities in Connecticut so his conditional freedom would be brought to an end, and she could go away with her lover. The appellant managed to escape from the officers and after hiding one or two nights in the “woods” and spending some time in a New York hotel, started out to locate his wife and Albonizio who had, meanwhile, started southward. His methodical, persistent, pursuit evidenced his determination to locate them. He got a ride to Raleigh, some way or other, then took a bus from there to Ft. Lauderdale where he registered at the Beacon Motel under the name of Mc-Nulty which appeared on a driver’s license he had obtained in a burglary.
*779 According to his own statement he established headquarters at the motel in Ft. Lauderdale, rented a car and set out for Hollywood, a few miles distant, where he thought his wife and Albonizio were living. He consulted the telephone directory to see if a ‘phone had been listed in the name of Albonizio or, possibly, Meade, and he questioned a grocer in the neighborhood about them. He had brought a pistol with him from Connecticut, and after he located the house occupied by the couple and the boy, he returned to Ft. Lauderdale and increased his firepower by purchasing a shotgun and ammunition for it. He also bought a hacksaw blade and a pinch bar, or “jim-mie bar.” He sawed off the barrel of the shotgun obviously so he could carry it more easily.
In the evening before the homicide, the appellant returned to Hollywood armed with the pistol and shotgun and equipped with the gun barrel and pinch bar. Upon arriving at the residence, he circled the block in which it was located to familiarize himself with the place and to determine who was in the house. Meanwhile he had called the house on the telephone and there had been no answer. After taking a position nearby for a while he decided to enter. He removed his shoes so he could go in stealthily. Upon finding the front door locked, he pried a window open with the pinch bar. Then followed the events we have described. He killed Albonizio in the bedroom by bludgeoning him with the shotgun and he dispatched his wife with the pistol in the living room.
Even if we assume that the appellant, when he started his chase, had the design only to kill Albonizio and intended to retrieve his wife without harming her, further examination of the statement he made demonstrates that he did in the end form a premeditated design to kill her too. In his statement it appears that he was asked the question: “[d]o you admit having murdered these two people?” and that he replied “I do.”
Nevertheless to clarify the distinction he undertakes to make between his designs on-Albonizio and on his wife we will now give in more detail the parts of appellant’s statement about the way he disposed of her. He said he tried to persuade her to go with him. She indicated that she would. Then she asked the appellant to kill her. They struggled for the possession of the pistol. He finally told her he would kill her if he had to but he “didn’t want to,” and “begged her to come with [him].” The altercation continued, the parties fought, the woman screamed. At the conclusion of a relatively short narrative he said: “I shot her. I don’t know if I shot her or if she squeezed the trigger with my finger or what, but I shot her I remember, and I remember shooting her the second time.” (Italics supplied.)
If the first fatal shot resulted unintentionally from the struggle for the pistol, the second one cannot be explained as an accident and this act coupled with what preceded it abundantly proved that the appellant decided to kill his wife and carried out his premeditated design.
All this taken from the statement made by the appellant which, to repeat, was introduced without objection, established meticulous preparation of a plan and coldblooded execution of it; and it belies the theory that appellant acted precipitately because of sudden passion. In other words, it proved that he formed a premeditated design to kill before he killed.
By another question the appellant asserts that he was not fairly tried because a medical examiner was permitted to state' that he had “examined another body that lay at that same address” and, upon further inquiry that it “was the body of a man.” This, argues the appellant, was prejudicial and its injurious effect was augmented by a charge defining murder in which the judge used the pronoun “him” instead of “her,” he being on trial for the murder of his wife and not for the murder of Albonizio.
*780 Aside from the fact that the two homicides were so closely linked as to amount to one transaction, and the detailed account of both given by the appellant in his statement, this writer has found in the record at least seven references to the body of Al-bonizio that were made without any objection on behalf of appellant.
So this point does not impress us.
The only other point we consider worthy of discussion is the one by which the appellant claims reversible error to have been committed because a witness for the state assailed appellant’s character when no evidence of good character had been introduced and the defendant had not testified. The witness, a police officer, in reciting a conversation between another officer and the appellant said the other officer felt that appellant was “aware of his civil rights as he had been in trouble before.” Appellant’s counsel objected to the answer, though he did not move to strike it, the court sustained the objection and charged the jury to ignore it. Then counsel asked for a mistrial which the court refused. We must reject the contention that this answer was of such character and the charge so ineffective that reversible error resulted. It appears in the record that the appellant in his own statement recounted his escape from the police and stated he had been “in trouble in Connecticut.” Furthermore, the boy had quoted the appellant as saying “it was a terrible thing what my mother [Evelyn Meade] had done, I mean calling the police on him [appellant],” and an officer testified that appellant told the witness about being sent to the penitentiary. There was no objection to this testimony. In such situation there is no justification for reversing the court on the tenuous ground proposed.
We have examined and considered the record in this case in the light of briefs filed and have also, pursuant to sub-paragraph (2) of Section 924.32, Florida Statutes 1953, F.S.A., reviewed the evidence to determine if the interests of justice require a new trial, with the result that we find no reversible error is made to appear and the evidence does not reveal that the ends of justice require a new trial to be awarded.
The judgment and sentence are affirmed.
TERRELL, C. J., and HOBSON, ROBERTS, .DREW, THORNAL and O’CON-NELL, JJ., concur.